Abe A. Danish and Davida Danish, et al. [1] v. Commissioner. Danish v. Commissioner
Docket Nos. 78660-78670, 79062.
United States Tax Court
T.C. Memo 1960-240; 1960 Tax Ct. Memo LEXIS 50; 19 T.C.M. (CCH) 1349; T.C.M. (RIA) 60240; November 15, 1960
Stanley L. Drexler, Esq., 1107 Mile High Center, Denver, Colo. and Melvin A. Coffee, Esq., for the petitioners. Richard J. Shipley, Esq., for the respondent. MURDOCK Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in the income tax of the petitioners in the amounts and for the years as follows: Deficiency
Petitioner
1955
1956
1957
Abe and Davida Danish
$ 472.40
Charles and Erma Beckwith
327.74
$ 298.43
$126.97
Walter and Eloise Degginger
356.82
377.83
153.69
Lloyd and Suzanne Joshel
1,968.15
2,022.12
812.64
John and Geneva Montgomery
$ 262.82
$ 326.97
$134.30
Carmina ad Mary Nelson
359.16
152.74
Robert and Helen Silber
2,229.95
2,465.78
814.95
Roy and Josephine Steil
409.41
487.15
Roy Stell
163.59
Frederick and Hilde Wolf
327.65
369.44
139.08
Simon and Selma Zevin
409.42
331.90
136.18
Thomas and Mae McKenna
477.71
561.46
230.61
*51 The only litigated issue is whether payments made by the Shell Chemical Corporation in the years in issue to the petitioners were gifts or taxable income to them. Findings of Fact The petitioners filed their income tax returns for the years in question with the district director of internal revenue at Denver, Colorado. Shell Chemical Corporation, during the years involved, paid to 29 persons, including the 12 male petitioners, sometimes referred to as "distributees," amounts measured by the gross sales of two insecticides, aldrin and dieldrin, distributed by Shell. Aldrin and dieldrin were developed by Julius Hyman & Company, a corporation organized in 1947, having its plant and principal offices near Denver, Colorado. Shell had been the distributor of aldrin and dieldrin for about two years and it acquired all of the outstanding stock of Hyman in April 1952. There was no employment relationship between any of the distributees and Shell, prior to its acquisition of the Hyman stock. The recipients of the payments were employees of Hyman who had been with the corporation since its organization and who were still employed at the time of Shell's stock purchase. They included *52 a purchasing agent, two welders, four chemists, two entomologists, a bookkeeper, a registered pharmacist, a storekeeper, an advertising man, a chemical engineer, an accountant, a sales manager, two salesmen, a chemist serving as treasurer, two research chemists, four maintenance foremen, an engineer, an instrument man, a civil engineer and an attorney. They were neither the most highly skilled, nor the most highly compensated employees of Hyman. They all held Hyman stock but their total stockholdings did not constitute a majority or the largest block of Hyman stock, either common or preferred. All of the recipients, prior to the organization of Hyman in 1947, were employed by Velsicol Corporation, a Chicago company engaged in the manufacture of chemicals, primarily resins, and some insecticidal compounds. The president and principal stockholder of Velsicol was Joseph Regenstein. Julius Hyman held a doctor's degree and was the other Velsicol stockholder. He was also executive vice-president and in charge of operations. Julius discovered an insecticide in the course of laboratory work which became known as chlordane. A dispute arose between Regenstein and Julius concerning their *53 proportionate interests in the corporation and whether Julius or Velsicol was the owner of the rights to manufacture and sell chlordane. The dispute became bitter and negotiations leading to possible settlement collapsed. Julius, believing chlordane to be his property, went to Denver and incorporated Julius Hyman & Company for the manufacture of chlordane. Between 40 and 50 employees of Velsicol, including the 29 recipients, followed Julius to Denver and joined with him in the organization of Hyman. All of the 40 to 50 former Velsicol employees subscribed for stock of Hyman in varying amounts. Hyman raised its initial capital primarily by selling for cash at par all 300,000 shares of its $1 par value preferred stock. Julius purchased 5,000 shares. Fourteen of the recipients purchased a total of 72,400 shares. Individual purchases varied from $800 to $12,500. The other 15 recipients made no investment in the preferred stock. Common stock was divided into two classes. One class was issued to the preferred stockholders for cash at 10" per share, its par value, the right to subscribe being limited to one share for each ten shares purchased of preferred stock. The other class (nonvoting) *54 was initially limited to 50,000 shares also having a 10" par value and was issued at par for cash, in the discretion of Julius and the directors, to employees who would be valuable in the development of Hyman. Julius, in exchange for the transfer of his rights and patents in and to chlordane, was issued a sufficient number of shares of common stock to give him majority ownership of the common stock. All of the distributees purchased common stock in varying amounts. They owned approximately 20 per cent of the common stock and approximately 24 per cent of the preferred stock. Thus, persons other than Julius and the distributees owned approximately 29 per cent of the common stock and 74 per cent of the preferred stock. Hyman's sales in the first year of operation were in excess of $1 million. Sales were at the rate of approximately $6 to $8 million per year when Shell purchased Hyman's stock in April 1952. Earned surplus grew very rapidly. Velsicol began litigation the month in which Hyman began production, contending that chlordane was its property and seeking an injunction against Hyman's production of chlordane and an accounting of Hyman's profits from chlordane. The trial court *55 held for Velsicol. Hyman was permitted to continue the manufacture of chlordane during the litigation by depositing monthly with an agent of the court amounts sufficient to keep the deposits equal to Hyman's earned surplus. Hyman was finally enjoined from the manufacture of chlordane and was obliged to pay Velsicol approximately $1,650,000. Hyman developed and began to market two new insecticides, aldrin and dieldrin in 1949 or 1950. Shell and Hyman entered into a contract in 1950 whereby Shell agreed to accept Hyman's entire output of aldrin and dieldrin and became the exclusive sales agent for those products in the United States and most foreign countries except Canada. Hyman retained a few individual customers with whom it had developed a close relationship. Velsicol again began litigation when Hyman started to market aldrin and dieldrin, contending that the development of aldrin and dieldrin stemmed from experiments performed in Velsicol's laboratories by Julius and other Hyman chemists then employed by Velsicol. Velsicol's contentions were again sustained by the court. Hyman was enjoined from the further manufacture of aldrin and dieldrin and was required to account for its *56 profits. This new adverse decision made it impossible for Hyman to continue in business unless an arrangement could be worked out with Velsicol. The profits from the sales of aldrin and dieldrin had been used to meet payrolls for between 750 and 800 employees and buy large quantities of raw materials. The decision of the trial court was announced on March 17, 1952. Shell was immediately notified. Shell was much concerned because of its large inventory of aldrin and dieldrin and its threatened loss of its source of supply of products in which it made heavy expenditures for advertising and organization of marketing facilities. Shell immediately sent a group of its key officers, including its president and its secretary, George E. Brewer, who was an attorney and served also as assistant to the president, to Denver to confer with representatives of Hyman and Velsicol. Shell hoped that since it was not a party to the litigation or the bitter feud between Regenstein and Hyman it might be able to negotiate a settlement between them. This proved impossible. It was determined that the only hope of salvaging Hyman as a going concern was the sale of all of its stock to Shell. Julius proposed *57 this approach to the Shell representatives and suggested a price of $10 per share for the common stock and $155 per share, representing cost plus accrued dividends, for the preferred. Shell agreed that this course represented the only means of continuing the production of aldrin and dieldrin and agreed to attempt to purchase all of Hyman's stock at the prices suggested provided that at least 95 per cent could be obtained by the end of April (then about 30 days away) and that within this period Shell could negotiate a settlement with Velsicol for a cash payment and the payment of future royalties on terms satisfactory to Shell. Shell deposited in escrow with a Denver bank a sum sufficient to purchase all of Hyman's outstanding stock at the agreed prices, the release of the money being conditioned upon deposits by Hyman's stockholders of the requisite stock and contracts to sell and the satisfaction of Shell's other conditions. Ninety-five per cent of the stock was deposited by about the middle of April and by April 22 all of Hyman's stock was deposited. Shell was able to work out an arrangement with Velsicol satisfactory to Shell, and the stock purchase was consummated as of April 30, 1952. *58 Hyman never paid any dividends on its common stock and only one dividend on its preferred stock during the 1947-1952 period, because of the pending litigation. Hyman had considered the payment of bonuses to its employees during 1950 and 1951, but because of the uncertainties of the litigation had not paid them. Shell, in the early part of April, indicated to Joshel, Hall, Miller and Silber, the four officers of Hyman other than Julius, that it had its own policies and procedures for selecting and grooming management and that it would be impossible for it to retain their services since they had not come up through the ranks in the Shell organization. They were told that they would be free to seek and accept other employment at any time after April 30, 1952, and that their salaries would be continued through 1952 regardless of the date of actual termination of services. Danish, although not an officer or director of Hyman, was notified that his employment would be terminated July 1, 1952, but that he would be paid his regular salary throughout 1952. This was done. The distributee group of 29 original employees felt uncertain and insecure about their future with Hyman after Shell took *59 over. An effort was made by some of the officers of Hyman to get Shell to agree to a general termination pay schedule for those employees who were not being retained by Shell. Shell rejected such proposals because it had termination pay policies worked out for its entire organization and would or could not deviate for these employees of Hyman. Shell indicated informally that it might be able to do something for these people and that it would give the subject some thought. Shell was aware that these 29 distributees had given up jobs with Velsicol, moved their families to Denver and invested some of their savings in Hyman; that they were tied to the success of the products; and that by selling their stock interest they were deprived of their former opportunity to participate in its future success. The basic manufacturing of aldrin and dieldrin was entirely new to Shell; it was coming into a new kind of operation; and it deemed important the retention of the good will of the people who had been most interested in the manufacture of the products. Shell wanted them to have some continuing stake in the success of the products which had been developed by Hyman. Joshel had negotiated with *60 the president of Shell relative to a participation in the receipts of Hyman by the 29 employees and came to a tentative understanding early in April. Brewer, sometime early in April 1952, after discussion within the company, suggested that Shell set aside, at least initially, one-half of one per cent of the gross sales of aldrin and dieldrin for payment to the distributees. This Shell decided to do. Julius had stated that he was severing all ties with Hyman after the sale of his stock and desired no participation in any arrangement for termination pay or other benefits. Brewer consulted with Joshel and to some extent with Silber and Hall about the matter and suggested they handle it as a group among themselves. Joshel furnished an allocation to Shell under which the four officers would receive equal distributions in amounts about 3 1/2 times greater than the equal amounts received by the 25 other distributees. The officers collectively received about 36 per cent of each total distribution and the employees about 64 per cent. Shell was not concerned with how the distributees shared the distributions among themselves and was willing to go along with whatever the Hyman officers suggested. *61 A letter from Shell, signed by its president, dated April 29, 1952, addressed jointly to the 29 distributees, advised them of its intention to distribute for an unspecified time an unstated portion of the proceeds of the sales of aldrin and dieldrin. The letter contained the following statements: * * * we realize it will be necessary for us to draw upon the information and experience of many of the people who have been associated with the company's past operations. This will be particularly true of the members of your group who have been with the company since its organization and have been most closely associated with its management. We should like to be free to consult and advise with any of you from time to time on such problems as may arise and it seems to us entirely fitting and proper that during the same time each of you should have some participation in the continuing success of Julius Hyman & Company and this, regardless of whether or not any of you continue in the employ of the company. * * *
It was contemplated that the participation plan might continue for five years and that the total payments would not exceed $300,000. No definite time or amount was stated *62 because Shell was uncertain as to what might happen in the future. Shell felt that the payments would be for a valid business purpose. It had no idea as to the extent it would be necessary to have these employees available for consultation. Sixteen of the distributees had left the employment of Hyman or Shell by May 1, 1957; 13 remained in the employment of Hyman or Shell. Of the 16 who left, 6 left in 1952, 6 in 1953, and 2 each in 1954 and 1955. One or two took jobs with competing organizations. Shell continued to make distributions throughout this period on the same formula to those who left and to those who remained. The fact that those who remained in the employment of Hyman or Shell throughout this period were receiving distributions was not taken into consideration in any way by Shell in fixing the salary, retirement pay or other benefits incident to employment of any such employee. Brewer was in close touch with the Hyman-Shell relationship throughout the period in question. He and Silber knew of no instance in which Shell ever called upon any of the distributees for any advice on any problem and believed that Shell never had occasion to do so. Silber, the secretary and *63 a director of Hyman, continued in the employment of Hyman or Shell until 1959, and served for several years as assistant secretary both of Shell and of Hyman under the Shell ownership, although originally notified by Shell that his services would not be required after April 30, 1952. He had special background on the Velsicol litigation and on Hyman's lease arrangements. He was then made a consultant and continued long after the distributions had terminated. Julius made known to Shell at the inception of the negotiations for the purchase by Shell of the Hyman stock that he wanted no connection whatsoever with Hyman or Shell after the sale of his stock. Miller and Hall left Shell on May 1, 1952, and Joshel left in June or July 1952. All three were paid until December 31, 1952. One of the distributees, Sidney Bartlett, died in 1953 or 1954. Miller was killed in an accident in 1955. Shell was notified of their deaths but continued to send distribution checks to them. Shell let it be known that it would raise no question about the widows cashing the checks. The base for computing the payments was reduced after the merger of Hyman and Shell because the sales price of the chemicals had increased. *64 Payments made under the participation plan varied from $181.70 to $5,835.72 per year for each of the officers; and from $51.41 to $1,651.32 per year for each of the other distributees. Shell was garnisheed in 1955 by a creditor of Henry Dudlak, one of the distributees. Shell stated to the Illinois Court to which the garnishee summons was returned that it owed no money to Dudlak, and that Shell had never had any contractual or employment relationship with Dudlak. Shell wrote the creditor's attorneys that payments to the distributees were entirely in the discretion of Shell as was the question of whether any additional payment would be made to any distributee. The District Director of Internal Revenue at Denver, Colorado, on June 9, 1958, addressed a letter to Shell inquiring as to the nature of the payments to the distributees. Shell replied by a letter dated July 15, 1958, from the General Manager of its Tax Department, as follows: * * *
Early in 1952 Shell Chemical Corporation completed the purchase from a number of people of all the outstanding shares of stock of Julius Hyman & Company, which company had perfected and produced, among other things, the chemical insecticides *65 known as aldrin and dieldrin. The management of Shell Chemical Corporation wanted to show its appreciation to twenty-nine employees of Julius Hyman & Company most closely associated with the former management and success of that company, and without regard to whether or not they continued in the employ of that company, by rewarding them for their past contributions in the development of these two products. Shell Chemical Corporation believed that a sensible, although arbitrary, means of determining the amounts of the rewards would be to measure them as a portion of the future sales of aldrin and dieldrin by Julius Hyman & Company. Shell Chemical Corporation was under no obligation to make the payments and intended that they be regarded as gifts to the recipients. Consequently, periodically thereafter, it made cash payments in the amounts and to the people listed on the attached schedule. No agreement was entered into between Shell Chemical Corporation and the recipients regarding these payments. The recipients were notified of Shell Chemical Corporation's intention to make the awards and were further notified when it was felt that no further payments should be made. No ruling from *66 the Bureau of Internal Revenue was obtained with respect to these payments. Although the payments were deducted by Shell Chemical in its returns, there was considerable confusion and uncertainty as to how they should be reported on the forms 1099, the result being that most of them at least were erroneously shown as "rents and royalties". Perhaps the 1099 forms should have contained a notation that they were in the nature of gifts. As heretofore noted, they were regarded as rewards in recognition for the recipients' former contributions, although there was no obligation owed by Shell Chemical Corporation and the payments were not compensation for personal services. Payments were made whether or not the recipients remained in the employ of Julius Hyman & Company and in fact several of the recipients terminated their services but nonetheless thereafter received the payments. * * *
The general manager of Shell's tax department had held the same position during the time when Shell was negotiating and completing the Hyman stock purchase and the Velsicol settlement and was kept currently advised of these transactions. Shell prepared and distributed to the distributees Treasury information *67 return Forms 1099 reporting the payments as having been made as "Salaries" or "Rents and Royalties." None of the minutes of stockholder or Board of Directors meetings of Hyman or Shell contains any discussion or authorization for the payments in question. None of the distributees was employed by Shell or by a subsidiary of Shell prior to April 30, 1952. Whatever contribution any of the distributees may have made to the development of aldrin or dieldrin or to the success of Hyman was not made in the course of any employment or other business relationship between any distributee and Shell or as a result of any incentive offered by Shell. The Commissioner determined that the payments received from Shell constituted taxable income to the distributees. All stipulated facts are incorporated herein by this reference. Opinion MURDOCK, Judge: The question here is whether the payments which these petitioners received during the taxable years from Shell were nontaxable gifts under section 102(a), Internal Revenue Code of 1954, as they contend, or whether they were taxable income, as the Commissioner has determined. This question must now be decided in the light *68 of the recent decision of the Supreme Court in Commissioner v. Duberstein, 363 U.S. 278. The Court there said, inter alia, that a voluntary transfer "without any consideration or compensation therefor, though a common-law gift, is not necessarily a 'gift' within the meaning of the statute"; "the mere absence of a legal or moral obligation to make such a payment does not establish that it is a gift"; the payment is not a gift if it "proceeds primarily from 'the constraining force of any moral or legal duty,' or from 'the incentive of anticipated benefit' of an economic nature"; if "'the payment is in return for services rendered, it is irrelevant that the donor derives no economic benefit from it'"; "A gift in the statutory sense * * * proceeds from a 'detached and disinterested generosity,' * * * 'out of affection, respect, admiration, charity or like impulses'"; and, finally, "the most critical consideration * * * is the transferor's intention'" and "'What controls is the intention with which payment, however voluntary, has been made.'" It is thus necessary to inquire and determine what the basic reason of the payor was for making the transfer. The dominant or basic *69 reason of Shell in making the transfers to each of the 29 distributees was the same, and the present record does not show that that reason, which explains why it made these transfers, was a "detached and disinterested generosity" springing from "affection, respect, admiration, charity or like impulses." The record indicates, rather, that the payments proceeded primarily from "the constraining force of [a] moral or legal duty" or from the incentive of anticipated benefits of an economic nature. Shell wanted to assure itself that it could have the cooperation of these 29 persons while it was entering into a new field of production. It made this known to the recipients. Shell decided to allow these people to have a small participation in the sales of the two products which Hyman had been producing for sale by Shell, with the understanding that Shell could call upon them for services or consultation during a limited period of time, if it saw fit to do so. Shell accounted for these payments and reported them on its returns as expenses of its business. The petitioners have called attention to the many differences that there were among the 29 distributees, to the letter of July 15, 1958, and *70 to many other circumstances. This, together with all of the other evidence in the record, has been taken into account, and the conclusion has been reached that these distributions were not gifts within the meaning of section 102(a). Commissioner v. Duberstein, supra.See also Estate of Mervin G. Pierpont, 35 T.C. - (10-19-60). Decisions will be entered for the respondent. Footnotes
1. The following proceedings are consolidated herewith: Charles A. Beckwith and Erma Louise Beckwith. Docket No. 78661; Walter Degginger and Eloise Degginger, Docket No. 78662; Lloyd M. Joshel and Suzanne W. Joshel, Docket No. 78663; John J. Montgomery and Geneva Montgomery, Docket No. 78664; Carmin R. Nelson and Mary E. Nelson, Docket No. 78665; Robert L. Silber and Helen F. Silber, Docket No. 78666; Roy C. Steil, Docket No. 78667; Roy C. Steil and Josephine L. Steil, Docket No. 78668; Frederick Wolf and Hilde Wolf, Docket No. 78669; Simon Zevin and Selma Zevin, Docket No. 78670; Thomas G. McKenna and Mae R. McKenna, Docket No. 79062.↩